**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

BURTON W. WIAND, as Receiver for
OASIS INTERNATIONAL GROUP, LTD.;
OASIS MANAGEMENT, LLC; AND
SATELLITE HOLDINGS COMPANY,

      Plaintiff,                        Case No.:

v.

CHRIS AND SHELLEY ARDUINI, et al.,

      Defendants.

_____/

## COMPLAINT

Burton W. Wiand (the "**Receiver**"), as Receiver for Oasis International Group, Limited; Oasis Management, LLC; and Satellite Holdings Company (collectively, the "**Oasis Entities**"), by and through his undersigned counsel, hereby files suit against the parties identified in paragraphs 10 through 84 of this complaint (collectively, the "**Defendants**") and alleges as follows:

## INTRODUCTION

1.      On April 15, 2019, the Commodity Futures Trading Commission ("**CFTC**" or "**Commission**") filed an enforcement action against (1) defendants Oasis International Group, Limited ("**OIG**"); Oasis Management, LLC ("**Oasis Management**"); Michael J. DaCorta ("**DaCorta**"); Joseph S. Anile, II ("**Anile**"); Francisco "Frank" L. Duran ("**Duran**"); Satellite Holdings Company ("**Satellite Holdings**"); John J. Haas ("**Haas**"); and Raymond P. Montie, III ("**Montie**") (the "**CFTC Defendants**") and (2) relief defendants

Mainstream Fund Services, Inc. ("**Mainstream**"); Bowling Green Capital Management, LLC ("**Bowling Green**"); Lagoon Investments, Inc. ("**Lagoon**"); Roar of the Lion Fitness, LLC ("**Roar of the Lion**"); 444 Gulf of Mexico Drive, LLC ("**444 Gulf of Mexico**"); 4064 Founders Club Drive, LLC ("**4064 Founders Club**"); 6922 Lacantera Circle, LLC ("**6922 Lacantera**"); 13318 Lost Key Place, LLC ("**13318 Lost Key**"); and 4Oaks, LLC ("**4Oaks**") (the "**CFTC Relief Defendants**" and, collectively with the CFTC Defendants, the "**Receivership Defendants**").  *See C.F.T.C. v. Oasis International Group, Ltd.*, Case No. 8:19-CV-886-T-33SPF (M.D. Fla.) (the "**CFTC Action**").

2.      The CFTC alleged that the defendants in the CFTC Action "have engaged, are engaging, or are about to engage in acts and practices in violation of Sections 4b(a)(2)(A)-(C), 4k(2), 4m(1), 4*o*(1)(A)-(B), and 2(c)(2)(iii)(I)(cc) of the Commodity Exchange Act (the "**CFTC Act**"), 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6(k(2), 6m(1), 6o(1)(A)-(B), 2(c)(2)(iii)(I)(cc) (2012), and Commission Regulations ("**CFTC Regulations**") 4.20(b)-(c), 4.21, 5.2(b)(1)-(3), and 5.3(a)(2), 17 C.F.R. § 4.20(b)-(c), 4.21, 5.2(b)(1)-(3), 5.3(a)(2) (2018).  Accordingly, the Commission brought the CFTC Action pursuant to Section 6c of the CFTC Act, 7 U.S.C. § 13a-1 (2012), and Section 2(c)(2)(C) of the CFTC Act, 7 U.S.C. § 2(c)(2)(C) (2012), to enjoin the CFTC Defendants' "unlawful acts and practices, to compel their compliance with the [CFTC] Act and the [CFTC] Regulations promulgated thereunder, and to enjoin them from engaging in any commodity-related activity."  CFTC Doc. 1 ¶¶ 5. 7.

3.      Also, on April 15, 2019, the court supervising the CFTC Action (the "**Receivership Court**") entered a temporary order appointing the Receiver.  CFTC Doc. 7. The Receivership Court directed him, in relevant part, to "[t]ake exclusive custody, control,

and possession of the Receivership Estate," which includes "all the funds, properties, premises, accounts, income, now or hereafter due or owing to the Receivership Defendants, and other assets directly or indirectly owned, beneficially or otherwise, by the Receivership Defendants." *See id.* at p. 14, ¶ 32 & p. 15, ¶ 30.b.  It also imposed a temporary injunction against the Receivership Defendants and froze their assets. *Id.* at p. 19. Subsequently, each Receivership Defendant either defaulted or consented to the entry of a preliminary injunction. *See* CFTC Docs. 35, 43, 44, 82, 85, 172, 174-77.

4.      On July 11, 2019, the Receivership Court entered a Consolidated Receivership Order (CFTC Doc. 177) (the "**Consolidated Order**"), which combined and superseded two prior orders (CFTC Docs. 7 & 44) and is now the operative document governing the Receiver's activities.  The Receivership Court found that entry of the Consolidated Order was necessary and appropriate for the purposes of marshaling and preserving all assets, including in relevant part, assets that "were fraudulently transferred by the [CFTC] Defendants and/or [CFTC] Relief Defendants."  CFTC Doc. 177 at 2.  The Receivership Court also expressly authorized the Receiver "to sue for and collect, recover, receive and take into possession all Receivership Property" (*id.* ¶ 8.B.) and "[t]o bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver" (*id.* ¶ 8.I.).  Similarly, the Court authorized, empowered, and directed the Receiver to "prosecute" actions "of any kind as may in his discretion, and in consultation with the CFTC's counsel, be advisable or proper to recover and/or conserve Receivership Property."  *Id.* ¶ 43.

5.     The CFTC Action is stayed to protect an ongoing criminal investigation into the CFTC Defendants' activities by the Department of Justice through the United States Attorney's Office for the Middle District of Florida.  As explained below, CFTC Defendant Anile has pled guilty to several felonies based, in relevant part, on his operation of the Oasis Entities as a classic Ponzi scheme.  He is awaiting sentencing.  CFTC Defendant DaCorta has also been indicted based on his fraudulent operation of the Oasis Entities.  He is awaiting trial.  Anile and DaCorta are hereinafter referred to collectively as the "**Insiders**."  CFTC Defendants Duran, Haas, and Montie have not yet been indicted, but the government's investigation is ongoing.

6.     The Receiver's activities under the Consolidated Order are exempt from the stay.  *See* CFTC Doc. 228.  As such, on February 28, 2020, the Receiver moved the Receivership Court to authorize his filing of "clawback" litigation and to retain additional counsel to assist with the litigation, which motion the Receivership Court granted on April 13, 2020.  CFTC Doc. 237.  The Receiver files this complaint pursuant to that express authority, the Consolidated Order, the principles governing federal equity receiverships, and pertinent law, including the Florida Uniform Fraudulent Transfer Act, Fla. Stat. § 726.101, *et seq.* ("**FUFTA**").

7.     The Receiver brings this action to recover money transferred to each Defendant by the Insiders through or on behalf of the Oasis Entities (or their fund administrator) in an amount that exceeds the amount invested by each Defendant in the Oasis Entities.  Such excess amounts are generally referred to as "**false profits**" because they are not derived from legitimate activity but from money the Ponzi perpetrators stole from other

4

defrauded investors. This scheme also included a multi-level-marketing component, and as a result, some Defendants received fraudulent transfers for recommending or convincing others to invest in the Oasis Entities. In either case, the Receiver is entitled to recover the transfers under governing and well-settled law.

## JURISDICTION AND VENUE

8.      This court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 754 and 28 U.S.C. § 1692, which provide jurisdiction over receivership property, including money and the individuals in possession of that money, and authorize nationwide service of process. The Receiver has complied with the statutory requirements.

9.      Schedules of the false profits or other fraudulent transfers the Receiver seeks to recover from the Defendants are attached to this complaint as "**Exhibit A**." The Defendants are arranged in alphabetical order, both below and in Exhibit A.

10.     On information and belief, defendants Chris and Shelley Arduini are residents of Montgomery County, New York. The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 1.

11.      On information and belief, defendants Scott and Tracy Arnold are residents of Ulster County, New York. The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 2.

12.     On information and belief, defendant Offer Attia is a resident of Westchester County, New York. The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 3.

13.     On information and belief, defendant John Bacon is a resident of Dutchess County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 4.

14.     On information and belief, defendants Steven and Margaret Barrie are residents of Wanaka, New Zealand. The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 5.

15.     On information and belief, defendant Sherry Barry is a resident of Warren County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 6.

16.     On information and belief, defendant Ann Barton is a resident of Dutchess County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 7.

17.     On information and belief, defendant Todd Berry is a resident of Dutchess County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 8.

18.     On information and belief, defendant Black Dragon Capital, LLC is a New York limited liability company with its principal place of business located in Richmond County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 9.

19.     On information and belief, defendants Maria and Louis Cardiello are residents of Putnam County, New York. The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 10.

20.     On information and belief, defendants Michael and Lesley Chambless are residents of Dallas County, Texas.  The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 11.

21.     On information and belief, defendants Joseph and Cushaun Charles are residents of Richmond County, New York. The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 12.

22.     On information and belief, defendant Mary Charuk is a resident of Broome County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 13.

23.     On information and belief, defendants Ron and Kim Clark are residents of New Castle County, Delaware. The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 14.

24.     On information and belief, defendant Commonwealth Network Marketing Corp is a New York corporation with its principal place of business located in Nassau County, New York. The transfers the Receiver seeks to record from this defendant are set forth in Exhibit A at 15.

25.     On information and belief, defendant Gregory Corcoran is a resident of Sussex County, New Jersey.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 16.

26.     On information and belief, defendant Crichlow Computer Concepts is a New York corporation with its principal place of business located in Kings County, New York.

The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 17.

27.     On information and belief, defendant Kayla Crowley is a resident of Wayne County, Pennsylvania.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 18.

28.     On information and belief, defendants Thomas and Anne Daidone are residents of Bergen County, New Jersey.  The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 19.

29.     On information and belief, defendant Benedetto Dalia is a resident of Dutchess County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 20-21.

30.     On information and belief, defendant Sabrina Dalia is a resident of Hartford County, Connecticut.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 22.

31.     On information and belief, defendants Gregory and Silvia Davis are residents of Dutchess County, New York.  The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 23.

32.     On information and belief, defendant Michael DeYoung is a resident of Broward County, Florida.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 24.

33.     On information and belief, defendant Divergent Investments, LLC is a Maryland limited liability company with its principal place of business located in Baltimore

8

County, Maryland.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 25.

34.    On information and belief, defendant Betsy Doolin is a resident of Putnam County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 26.

35.    On information and belief, defendant Mariana Duenas is a resident of Westchester County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 27.

36.    On information and belief, defendant Patrick Flander is a resident of Montgomery County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 28-29.

37.    On information and belief, defendants Henry and Anna Fuksman are residents of Chemung County, New York. The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 30.

38.    On information and belief, defendant Rocco Garbellano is a resident of Dutchess County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 31-32.

39.    On information and belief, defendants Robert and Loreta Giamboi are residents of Richmond County, New York. The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 33.

40.     On information and belief, defendant Jason Gladman is a resident of Fairfield County, Connecticut. The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 34.

41.     On information and belief, defendant Ethel Haley is a resident of Fairfield County, Connecticut.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 35.

42.     On information and belief, defendant Elmore Runee Harris is a resident of Fairfield County, Connecticut.   The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 36.

43.     On information and belief, defendant Anne Hennessey is a resident of Putnam County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 37.

44.     On information and belief, defendant Chad Hicks is a resident of Jackson County, Illinois.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 38.

45.     On information and belief, defendants Kenji and Tami Higuchi are residents of Fairfield County, Connecticut. The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 39.

46.     On information and belief, defendants Richard and Courtney Hubbard are residents of Bergen County, New Jersey. The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 40.

47.     On information and belief, defendant Charles Huckabee is a resident of Orange County, Florida.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 41.

48.     On information and belief, defendant Tim Hunte DBA KATT Distribution is a resident of Lehigh County, Pennsylvania.  Mr. Hunte has a second account in the name of Timothy Hunte and James Jackson. On information and belief, James Jackson is a resident of Lehigh County, Pennsylvania. The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 42-43.

49.     On information and belief, defendant Impulse Ventures, Inc. is a Delaware corporation with its principal place of business located in New Castle County, Delaware. The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 44.

50.     On information and belief, defendant Alan Johnston is a resident of Smith County, Texas.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 45.

51.     On information and belief, defendants Bradley and Carrie Kantor are residents of Monroe County, Florida.  The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 46.

52.     On information and belief, defendant Kerrigan Management, Inc. is a New York corporation with its principal place of business located in Putnam County, New York. The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 47-48.

53.     On information and belief, defendant Kevin Kerrigan is a resident of Putnam County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 49-50.

54.     On information and belief, defendant Brenda Krown is a resident of Broward County, Florida.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 51.

55.     On information and belief, defendant Tami Lacy is a resident of Greene County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 52.

56.     On information and belief, defendants Joseph and Lynne LaVecchia are residents of Columbia County, New York.  The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 53-54.

57.     On information and belief, defendant Matthew Leach is a resident of Greene County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 55-57.

58.     On information and belief, defendant Life's Elements, Inc. is a New York corporation with its principal place of business located in Suffolk County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 58.

59.     On information and belief, defendant David Paul Lipinczyk is a resident of Monroe County, New York. The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 59-60.

60.    On information and belief, defendant Piotr Luda is a resident of Collin County, Texas.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 61.

61.    On information and belief, defendant Wayne Lynch is a resident of Montgomery County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 62.

62.    On information and belief, defendant Shawn Marshall is a resident of Nassau County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 63.

63.    On information and belief, defendant Joseph Martini, Jr. is a resident of Westchester County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 64.

64.    On information and belief, defendant Joseph Martini is a resident of Westchester County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 65.

65.    On information and belief, defendant Kathryn McClare is a resident of Monroe County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 66.

66.    On information and belief, defendant Mary McClare is a resident of Monroe County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 67.

67.    On information and belief, defendant Elizabeth McMahon is a resident of Alameda County, California.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 68.

68.    On information and belief, defendants Stephen and Jean Monahan are residents of Sarasota County, Florida.  The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 69.

69.    On information and belief, defendant Frank Nagel is a resident of Putnam County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 70.

70.    On information and belief, defendant Nick Patterson is a resident of Wayne County, Pennsylvania.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 71.

71.    On information and belief, defendant Vince Petralis, Sr. is a resident of Monroe County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 72-73.

72.    On information and belief, defendant Vince Petralis is a resident of Monroe County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 74.

73.    On information and belief, defendant Anthony Procopio is a resident of Fairfield County, Connecticut.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 75.

74.     On information and belief, defendant Jerry Puccio is a resident of Bergen County, New Jersey.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 76.

75.     On information and belief, defendant Jay Renner is a resident of Delaware County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 77.

76.     On information and belief, defendant Michael Rubel is a resident of Richmond County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 78.

77.     On information and belief, defendant Margaret Sims is a resident of Fairfield County, Connecticut. The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 79.

78.     On information and belief, defendants Allen and Loreen Steinfeld are residents of Sarasota County, Florida.  The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 80.

79.     On information and belief, defendant Ford Sumner is a resident of Wellington, New Zealand.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 81.

80.     On information and belief, defendants Edgar and Donna Uhler are residents of Pike County, Pennsylvania.   The transfers the Receiver seeks to recover from these defendants are set forth in Exhibit A at 82.

81.     On information and belief, defendant Carmine Vona is a resident of Dutchess County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 83.

82.     On information and belief, defendant David Wilkerson is a resident of Monroe County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 84.

83.     On information and belief, defendant Stefania Wood is a resident of Dutchess County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 85.

84.     On information and belief, defendant Zhuo Xu is a resident of Queens County, New York.  The transfers the Receiver seeks to recover from this defendant are set forth in Exhibit A at 86.

85.     The Court has subject matter jurisdiction over this case pursuant to 7 U.S.C. § 13a-1, 28 U.S.C. § 754, and principles of ancillary or supplemental jurisdiction under 28 U.S.C. § 1367.  The Receiver brings this complaint to accomplish the objectives of the CFTC Action and Consolidated Order and its predecessors, and thus this matter is ancillary to the Receivership Court's exclusive jurisdiction over the receivership estate.

86.     Venue in this District and Division is proper under 28 U.S.C. § 754, as this proceeding is related to the CFTC Action pending in this District, and the Receiver was appointed in this District.

## OTHER PARTIES AND RELATED INDIVIDUALS AND ENTITIES

87.     Burton W. Wiand is the duly appointed and acting Receiver for the Oasis Entities and other Receivership Defendants.  He is a citizen of Florida and a resident of Pinellas County, Florida.

88.     Oasis International Group, Limited is a corporation formed in the Cayman Islands by DaCorta, Anile, and Montie, who were OIG's only members – *i.e.*, owners.  As further explained below, they also served on OIG's board of directors and operated OIG from its office at 444 Gulf of Mexico Drive, Longboat Key, Florida, which was purchased entirely with money they misappropriated from investors.  OIG acted as a commodity pool operator by soliciting, receiving, and accepting funds purportedly for trading by a related company:  first, Oasis Global FX, Limited and then Oasis Global FX, SA – *i.e.*, the "**Oasis Pools**."  These companies were registered in New Zealand and Belize, respectively, and were purportedly introducing brokers that would trade currencies or currency-related contracts.  In truth, very little trading occurred, and almost all money allocated for that purpose was lost.  OIG was not registered with the Commission in any capacity.

89.     OIG is a creditor of, at minimum, the Insiders under pertinent fraudulent transfer law.  The Consolidated Order and its predecessors transferred control of OIG to the Receiver, who has also executed documents to convey ownership from DaCorta, Anile, and Montie.  As such, the Receiver now controls OIG, which has been cleansed of its former owners' wrongdoing and is thus entitled to the return of fraudulently transferred funds.

90.     Oasis Management, LLC is a Wyoming limited liability corporation formed in November 2011.  DaCorta controlled Oasis Management and its bank accounts.  Oasis Management acted as a commodity pool operator for the Oasis Pools by accepting and

17

receiving funds from pool participants.  As set forth in Exhibit A, many of the fraudulent transfers the Receiver seeks to recover were made from Oasis Management's bank accounts. Oasis Management was not registered with the Commission in any capacity.

91.    Oasis Management is a creditor of, at minimum, the Insiders under pertinent fraudulent transfer law.  The Consolidated Order and its predecessors transferred control of Oasis Management to the Receiver from DaCorta.  As such, the Receiver now controls Oasis Management, which under pertinent law, has been cleansed of DaCorta's wrongdoing and is thus entitled to the return of fraudulently transferred funds.

92.    Michael J. DaCorta was a resident of Lakewood Ranch, Florida (where he lived in a lavish home purchased entirely with investor funds).  In 2006, DaCorta was listed with the National Futures Association ("**NFA**") as a principal and registered with the Commission as an associated person of a registered commodity trading advisor, but he withdrew his listing and registration as part of a 2010 settlement with the NFA.  He was also permanently banned from registering with the Commission in any capacity.

93.    On January 7, 2010, DaCorta filed a Chapter 7 petition in the United States Bankruptcy Court for the Southern District of New York.  He listed almost $600,000 in debt, including delinquent credit card payments and unpaid property taxes.  He also disclosed ownership of two businesses – Strata Capital, Inc. and DaCorta Group, Inc. d/b/a International Currency Traders, Ltd. ("**ICT**") – both of which he valued at only $1.00.  Prior to DaCorta's bankruptcy, ICT failed, and its trading accounts were terminated, causing massive losses for its customers.  On April 8, 2010, a lawsuit was filed against DaCorta and

International Currency Traders, Ltd., which was addressed through his bankruptcy proceeding. *See Giudice v. DaCorta, et al.*, Case No. 1:10-cv-03028-VM (S.D.N.Y. 2010).

94.     Finally, on April 9, 2014 (years after he began this scheme), a foreclosure action was filed against DaCorta with respect to property he owned in New York. *See Goshen Mortgage LLC v. DaCorta et al.*, Case No. 03-2014-50105 (N.Y. Sup. Ct. 2014). All or almost all of this information was available to the public and thus to DaCorta's business partners.

95.     Nevertheless, DaCorta co-founded OIG with Anile and Montie in 2013. At all relevant times, he was a principal shareholder and director of OIG. He was also the chief executive officer and the chief investment officer and opened and was the sole signatory on Oasis Management's bank accounts.

96.     Joseph S. Anile, II was a resident of Sarasota, Florida (where he also lived in a lavish home purchased entirely with investor funds). Anile co-founded OIG with DaCorta and Montie and was its president as well as a principal shareholder and director. Anile controlled OIG's bank accounts. Additionally, Anile opened trading accounts for the Oasis Pools. Anile assisted in facilitating real estate purchases with pool funds and making non-forex investments with pool funds. Anile has never been registered with the Commission in any capacity.

97.     Raymond P. Montie, III, is a resident of Jackson, New Hampshire. Montie co-founded OIG with Anile and DaCorta and was a vice president as well as a principal shareholder and director. He was also OIG's executive director of sales. Montie has never been registered with the Commission in any capacity.

98.     Satellite Holdings Company is a South Dakota corporation formed in October 2014.   CFTC Defendant Haas was Satellite Holdings' director.   The company acted as a commodity pool operator by soliciting, receiving, and accepting funds from pool participants for investment in the Oasis Pools.  Haas assisted pool participants who wished to invest their retirement funds in the Oasis Pools.  Haas has never been registered with the Commission in any capacity.  Satellite Holdings is not registered with the Commission in any capacity.

99.     Satellite Holdings is a creditor of, at minimum, the Insiders under pertinent fraudulent transfer law.   The Consolidated Order and its predecessors transferred control of Satellite Holdings to the Receiver from Haas.   As such, the Receiver now controls Satellite Holdings, which under pertinent law, has been cleansed of the Insiders' and Haas' wrongdoing and is thus entitled to the return of fraudulently transferred funds.

100.     Finally, the Oasis Entities used a company called Fundadministration, Inc. and later Mainstream Fund Services, Inc. (collectively, "**Mainstream**") to, among other things, make transfers to investors.  As demonstrated by Exhibit A, most investors received transfers from accounts controlled by Oasis Management, but some received transfers from accounts operated by Mainstream for the benefit of the Oasis Entities.

## FACTS COMMON TO ALL CAUSES OF ACTION

101.     Insiders defrauded investors through their control of the Oasis Entities.   No investor in the Oasis Entities received <u>actual</u> profits from forex trading because there were none.   All purported trading gains were fabricated and fictitious.   Many investors never received any transfers from the Oasis Entities, or they received transfers in an amount that was less than the amount they invested.  As such, each of those investors suffered a net loss.

102.    On the other hand, some investors received transfers from the Oasis Entities of purported trading profits, principal redemptions, and/or referral fees in an amount that exceeded the amount they invested.  As such, each of those investors experienced a net gain – *i.e.*, false profits.   Whether characterized as interest, principal, trading gains, spread income, referral fees or any other label, all transfers to investors were funded exclusively with money stolen from other investors.  As such, the Insiders operated the Oasis Entities as a classic Ponzi scheme.  *See, e.g., Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014) ("A Ponzi scheme uses the principal investments of newer investors, who are promised large returns, to pay older investors what appear to be high returns, but which are in reality a return of their own principal or that of other investors.").

103.    The Defendants were among the investors who received false profits.  In other words, each Defendant received transfers in connection with the Defendant's investment(s) in one or more of the Oasis Entities (or referral fees, if the Defendant did not make an investment and only referred others) that exceeded the amount(s) the Defendant invested. The Receiver seeks to avoid these transfers under FUFTA.  In the alternative, the Receiver seeks disgorgement of the transfers pursuant to equitable claims of unjust enrichment.

    A.    **Insiders Operated The Oasis Entities As A Common Enterprise**

104.    Although certain Oasis Entities had different owners, there was no meaningful distinction between them.  For example, the sole purpose of Satellite Holdings was to funnel retirement money to OIG and Oasis Management.   If an individual wanted to transfer retirement money from his or her IRA to the scheme, the individual would typically execute

21

a "promissory note" with Satellite Holdings (signed by Haas), which would immediately execute a substantively identical "promissory note" with OIG.

105.    Among other things, OIG, Oasis Management, and Satellite Holdings shared the same office and employees, commingled funds, and operated under one overarching name – "Oasis."   Additionally, DaCorta and/or Anile owned and controlled OIG, Oasis Management, and the Oasis Pools.  Haas owned and controlled Satellite Holdings, but also worked for OIG.

106.    The Oasis Entities also operated one common website located at www.oasisinternationalgroupltd.com.[1]  According to this website, Oasis "provides an array of asset management and advisory services, including corporate finance and investment banking . . . investment sales/trading and clearing services . . . financial product development, and alternative investment products."  Investors were able to use the website to view their purported account balances.  On a daily basis, those balances reflected allocations of so-called "spread" income the Ponzi perpetrators claimed to have earned through affiliates of the Oasis Entities (*i.e.*, the Oasis Pools), but in truth, any purported spread income (approximately $40 million) was subsumed by trading losses (approximately $60 million). The data the website made available to investors was thus false and completely fabricated.

107.    The website also had a banner prominently displayed across the bottom of each page, which stated:

> The services and products offered by Oasis International Group Ltd. are *not being offered* within the United States (US) and [are] not being offered to US

---

[1]  Given the Receiver's appointment and the collapse of the scheme, this website is no longer operational.

persons, as defined under US law. As such, should you reside in, or be a citizen, or a taxpayer of the US or any US territory, any email message received is not intended to serve as a solicitation or inducement on behalf of any of the aforementioned entities.

Despite this disclaimer, the Insiders solicited hundreds (if not thousands) of U.S. residents to invest in the Oasis Pools and accepted funds from at least 700 U.S. residents.

108.    OIG, Oasis Management, and Satellite Holdings had no policies, procedures or financial controls, did not keep regular or accurate books and records, and did not prepare regular or accurate financial or pool performance statements.

**B.    The Insiders Operated The Oasis Entities As A Ponzi Scheme**

109.    From as early as 2011 through April 2019, the Insiders and others raised millions of dollars from approximately 700 investors on behalf of one or more of the Oasis Entities through the offer and sale of securities in the form of "partnership interests" and later "promissory notes" as part of a single, continuous Ponzi scheme (the "**scheme**").

110.    In relevant part, the Insiders and others represented to investors and potential investors that their money would be used to trade forex contracts and to generate "spread income" by matching trades.  Insiders and others fraudulently guaranteed investors that the Oasis Pools would earn substantial income and, in fact, could not lose money using this purported strategy.  More specifically, the Insiders and other CFTC Defendants made material misrepresentations to investors, including that (a) all investor funds would be traded in forex; (b) investors would receive a minimum guaranteed annual return of 12%; (c) the Oasis Pools were always profitable, had made returns of approximately 22% in 2017 and approximately 21% in 2018; (d) the Oasis Pools never lost money; (e) returns were from profitable trading; (f) the Oasis Pools were "no risk" investments; (g) investors would receive

additional returns by referring other investors; and (h) investments were secured by $15-$16 million in real estate owned by OIG. On information and belief, investors transferred money to the Oasis Entities based on those representations.

111.    The representations, however, were patently false, and in fact (a) tens of millions of dollars raised were used for Ponzi payments and unauthorized personal and business expenses; (b) investor returns were completely fraudulent and funded by Ponzi payments of new investor money repaying older investors; (c) the Oasis Pools were never profitable and had large negative returns in 2017 and 2018; (d) the Oasis Pools always lost money, including purported spread income; (e) returns were not from profitable trading, but were, again, Ponzi payments of new investor money repaying older investors; (f) the Oasis Pools were high risk investments that had a leverage ratio of 100:1; (g) investors' referral fees were, again, Ponzi payments of new investor money paying older investors; and (h) investments were not secured by $15-$16 million in real estate owned by OIG.

112.    In truth, the Oasis Entities derived their assets from investors' principal investments, which were pooled and commingled in common accounts, including a single trading account. Specifically, the Receiver's forensic accountants have conducted a preliminary analysis of the principal bank account (0764 – the "**Account**") through which the Insiders (via the Oasis Entities and their fund administrator) conducted transactions worth tens of millions of dollars in connection with the scheme. According to that preliminary analysis:

- the sole source of inflows to the Account appears to have been money, directly or indirectly, from defrauded investors;

- the Insiders (acting through Oasis Entities and their fund administrator) transferred more than $18 million from the Account (and approximately only $21.4 million in total) to ATC Brokers Ltd. ("**ATC**") – a company based in the United Kingdom through which fraudulent and unprofitable trading occurred;

- ATC never transferred any money back to the Account, which is reflected in both the fund administrator's and ATC's records – in other words, there were no profits;

- nevertheless, the Insiders and their fund administrator transferred millions of dollars from the Account to the CFTC Defendants and other wrongdoers;

- the Insiders and their fund administrator also transferred millions of dollars from the Account to CFTC Relief Defendants and others to buy real estate (in which certain CFTC Defendants resided at the investors' expense) and gold and silver, which transactions were inconsistent with OIG's stated purpose; and finally

- the Insiders and their fund administrator transferred millions of dollars to investors from the Account, including the Defendants here, despite the lack of any trading profits from ATC.

In other words, the Insiders and their fund administrator used investor money to make payments to other investors without ever processing any actual trading profits. Again, that is the definition of a Ponzi scheme.

113.  An examination of daily records further illustrates the scheme. For example, On January 7, 2019 (only weeks before the CFTC terminated this fraud), the opening balance of OIG "Account 8346" was $5,228,038.91. (In comparison, OIG owed investors more than $100 million, according to its records.) Mainstream received a $1 million wire from two investors (who, according to the Receiver's records, lost approximately $942,000 in the scheme) and immediately used that money (and more) to make 52 transfers to other

investors, sales agents, and defendants.[2]  After these transfers, the balance of Account 8346 was $4,971,382.51.  *See, e.g.,* **Exhibit B**.  New investors were lured into the scheme, and the Insiders and their fund administrator immediately transferred their money to prior investors, sales agents, and associated wrongdoers.  The balance of Account 8346 at the end of January 7, 2019 was lower than the balance at the beginning of that day, and this pattern repeated itself until the CFTC terminated the fraud.

114.    The Oasis Entities' investment returns and performance as represented to investors and potential investors from the inception of the scheme were false and were based on grossly overstated performance numbers created by the Insiders.  The true results of the trading activity that occurred were never reported to investors or potential investors.

115.    The Insiders caused the Oasis Entities to pay millions of dollars in fees and similar compensation.  Because those fees were based on fabricated returns, the Insiders improperly and wrongfully diverted money from the Oasis Entities.

116.    Aside from paying fees, the Insiders caused the Oasis Entities to make transfers to investors that the investment performance of the Oasis Entities never supported.  Through those transfers, the Insiders improperly and wrongfully diverted money from the Oasis Entities.

117.    Similarly, following requests from investors for redemptions of their principal investments, the Insiders intentionally and wrongfully caused the Oasis Entities to pay relevant investors sums of money that were equivalent to all or part of the principal invested by those investors.

---

[2]  Certain Defendants in Exhibit A were among the transferees.

118. For investors who did not request distributions, fictitious trading and investment profits were "credited" to the investors' purported accounts with the Oasis Entities. These fictitious profits were likewise unsupported by the Oasis Entities' investment performance and only served to further increase the Oasis Entities' insolvency.

119. These (and all other) transfers that the Insiders caused the Oasis Entities and their fund administrator to make to investors were paid from the fruits of the scheme. Specifically, they were paid almost exclusively from: (1) principal investment money from new investors; (2) existing investors' principal investment money; and (3) additional principal investment money from existing investors.

120. These distributions were not distributions of actual trading gains or of the recipients' principal investments. Indeed, there were no actual trading gains. All of the money transferred to ATC (which was only a fraction of the money raised) was lost with the exception of approximately $2 million that was frozen and seized by the Department of Justice in cooperation with the United Kingdom's National Crime Agency.

121. Because the "account statements" and investor website did not reflect the true nature of the Insider's and the Oasis Entities' activities, by intentionally and wrongfully causing the Oasis Entities to pay those amounts to investors, the Insiders improperly diverted assets of the Oasis Entities to both perpetrate and perpetuate the scheme.

122. The investors relied upon the fictitious and overstated trading gains purportedly achieved by the Insiders and the purported payment of principal redemptions upon request to make additional investments with the Insiders and the Oasis Entities and to refer friends, family, and business colleagues to do the same.

123.    The principal investment money from new investors, the existing investors' principal investment money, and the existing investors' additional principal investment money should have been used for the stated purpose of the Oasis Entities' business, which was to conduct profitable forex trading.

124.    The Oasis Entities were harmed by this unauthorized course of conduct, which was effectuated by the Insiders through the Oasis Entities in furtherance of the scheme.  This conduct dissipated assets of the Oasis Entities.

125.    The negative cash flow of the Oasis Entities made the eventual collapse of the scheme inevitable.

C.    **Insider Anile's Guilty Plea and Insider DaCorta's Indictment**

126.    On August 8, 2019, defendant Anile pled guilty to three counts involving the scheme – (1) conspiracy to commit wire and mail fraud; (2) engaging in an illegal monetary transaction; and (3) filing a false income tax return.  *See United States of America v. Joseph S. Anile, II,* Case No. 8:19-cr-334-T-35CPT (M.D. Fla.) (the "**Anile Criminal Action**" or "**ACA**").  A copy of Anile's plea agreement is attached as **Exhibit C**, which contains the following admissions:

> From at least as early as November 2011, through and including at least April 18, 2019, in the Middle District of Florida, the defendant, Joseph S. Anile, II, conspired with others to commit wire fraud and mail fraud.  The defendant and coconspirators made false and fraudulent representations to victim-investors and potential investors to persuade them to transmit their funds, via wire and mail, to entities and accounts controlled by conspirators to be traded in the foreign exchange market ("FOREX").  In fact, the defendant and coconspirators used only a portion of the victim-investors' funds for FOREX trading, and the trading resulted in losses which conspirators concealed.  **They used the balance of the victim-investors' funds to make Ponzi-style payments, to perpetuate the scheme**, and for their own personal enrichment….

28

In soliciting investments, the defendant and coconspirators made multiple false and fraudulent representations and material omissions in their communications to victim-investors and potential investors. In particular, they promoted one of the conspirators as an experienced FOREX trader with a record of success, but concealed the fact that he had been permanently banned from registering with the CFTC and was prohibited from soliciting U.S. residents to trade in FOREX and from trading FOREX for U.S. residents in any capacity. They also fraudulently represented that: (a) conspirators did not charge any fees or commissions; (b) investors were guaranteed a minimum 12 percent per year return on their investments; (c) conspirators had never had a month when they had lost money on FOREX trades; (d) interest and principal payments made to investors were funded by profitable FOREX trading; (e) conspirators owned other assets sufficient to repay investors' principal investments; and (f) an investment with conspirators was safe and without risk.

Ex. C at 26-28 (emphasis added). Anile's guilty plea has been accepted, and he is currently awaiting sentencing.

127.    On December 17, 2019, a federal grand jury returned a two-count indictment against defendant DaCorta, alleging conspiracy to commit wire and mail fraud as well as engaging in an illegal monetary transaction. *See United States of America v. Michael J. DaCorta,* Case No. 8:19-cr-605-T-02CPT (M.D. Fla.) (the "**DaCorta Criminal Action**" or "**DCA**"). A copy of the indictment is attached as **Exhibit D**. According to the grand jury, as early as November 2011, DaCorta entered into a conspiracy to defraud investors by making numerous fraudulent representations. *See* DCA Doc. 1 ¶ 14b.-d.

It was a further part of the conspiracy that conspirators would and did use funds "loaned" by victim-investors to: (i) conduct trades, via an offshore broker, in the FOREX market, which trades resulted in catastrophic losses; (ii) **make Ponzi-style payments to victim-investors**; (iii) pay expenses associated with perpetuating the scheme; and (iv) purchase million-dollar residential properties, high-end vehicles, gold, silver, and other liquid assets, to fund a lavish lifestyle for conspirators, their family members and friends, and otherwise for their personal enrichment.

*Id.* at ¶ 14k (emphasis added). As of this filing, DaCorta is awaiting trial. The government has not yet indicted CFTC Defendants Montie, Hass, or Duran, but its investigation remains open and ongoing.

### D.    Transfers To The Defendants

128.    The Defendants were generally investors in one or more of the Oasis Entities and received purported trading gains and/or purported principal redemptions in an amount which exceeded each Defendant's principal investment. Some Defendants did not invest in the scheme; rather, they were paid fees for referring investors, and those payments are also recoverable as fraudulent transfers. While the Defendants and other investors received false profits, all but a few of the rest of the investors in the Oasis Entities lost money.

129.    Specifically, as detailed in Exhibit A attached hereto and incorporated herein, based on the records reviewed by the Receiver as of the filing of this complaint, between 2012 and 2018, the Insiders caused one or more of the Oasis Entities and their fund administrator to pay purported trading gains and/or purported principal redemptions to each Defendant. These transfers are itemized in Exhibit A, which details the date and amount of each such transfer and the bank account from which the transfer was paid.

130.    Further, as detailed in Exhibit A, based on the records reviewed by the Receiver as of the filing of this complaint, between 2012 and 2019, most Defendants invested an amount in one or more Oasis Entities. Those investments are itemized in Exhibit A, which details the date and amount of each such deposit and the bank account to which each deposit was made.

131.    Also as detailed on Exhibit A, in light of those deposits and transfers, the distributions to each Defendant exceeded the Defendant's deposits.  The amount of that excess represents the Defendant's false profits or otherwise avoidable transfers, which is itemized on Exhibit A.  Each Defendant's false profits or otherwise avoidable transfers (whatever the final amount is determined to be following discovery) is the amounts the Receiver seeks to recover in this suit.

132.    To allow the Defendants to keep their false profits would be inequitable and unjust, including to the investors in the Oasis Entities as a whole.

133.    All money the Insiders wrongfully caused the Oasis Entities to transfer or pay to the Defendants was diverted and misappropriated by the Insiders in furtherance of the scheme.  Thus, all the money transferred or paid to the Defendants were improperly diverted assets of one or more of the Oasis Entities.

## COUNT I
**Florida Statutes § 726: Uniform Fraudulent Transfer Act**
**False Profits**

134.    The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 133.

135.    Because the Insiders intentionally and wrongfully caused the transfer to the Defendants of investors' commingled principal investment money in an amount equivalent to each Defendant's false profits from one or more of the Oasis Entities as identified in Exhibit A under the circumstances alleged in this complaint, the Oasis Entities, through the Receiver, have a right to repayment of at least that amount from each Defendant.

136.    In light of this right to repayment (and independently because the Insiders' conduct alleged in this complaint with respect to the Oasis Entities amounted to embezzlement, breach of fiduciary duty, breach of contract, fraud, and/or other violations of law), the Oasis Entities have a claim against the Insiders and consequently are creditors of the Insiders under FUFTA.  Accordingly, the Insiders are debtors under that act.

137.    The transfers of false profits that the Insiders caused the Oasis Entities to make to each Defendant were inherently fraudulent because the transfers were made as part of the scheme.

138.    Those transfers were fraudulent under Florida Statutes § 726.105(1)(a) because the Insiders caused Oasis Entities to make the transfers with actual intent to hinder, delay, or defraud creditors of the Insiders and/or the Oasis Entities.

139.    Those transfers also were fraudulent under Florida Statutes § 726.105(1)(b) because: (a) the Insiders caused Oasis Entities to make those transfers; and (b)(i) the Insiders and the Oasis Entities were engaged or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction; or (ii) the Insiders intended that they and/or the Oasis Entities incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due.

140.    Those transfers also were fraudulent under Florida Statutes § 726.106(1) because neither the Insiders nor the Oasis Entities received a reasonably equivalent value in exchange for those transfers to each Defendant, and the Insiders and the Oasis Entities were insolvent at all relevant times.

141.     On behalf of the Oasis Entities from which money was transferred to each Defendant as identified in Exhibit A, the Receiver is entitled to avoid and recover transfers equal to the amount of false profits that the Insiders caused those Oasis Entities to make to each Defendant (and to any other pertinent remedy, including those available under Florida Statutes § 726.108).

142.     On behalf of the other Oasis Entities, the Receiver is entitled to avoid and recover those transfers because (i) money was commingled among the Oasis Entities and (ii) the Insiders used the Oasis Entities as a single, continuous scheme.

WHEREFORE, the Receiver asks this Court to enter judgment against each Defendant avoiding transfers from the Oasis Entities in the amount of each Defendant's false profits, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

## COUNT II
### Unjust Enrichment
### False Profits

143.     The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 133.

144.     This unjust enrichment claim is asserted in the alternative, in the event the statutory remedy asserted in Count I does not provide an adequate remedy at law.

145.     Each Defendant received a benefit when during the course of the scheme, the Insiders wrongfully caused Oasis Entities to transfer money to each Defendant in an amount equal to each Defendant's false profits.

146.    Each Defendant knowingly and voluntarily accepted and retained a benefit in the form of those false profits.

147.    The circumstances alleged in this complaint render each Defendant's retention of that benefit inequitable and unjust, including to the investors of the Oasis Entities as a whole, so each Defendant must pay the Receiver, acting on behalf of the Oasis Entities, the value of the benefit received.

148.    Each Defendant has been unjustly enriched at the expense of the Oasis Entities (and, ultimately, their investors) in the amount of each Defendant's false profits, and the Oasis Entities, through the Receiver, are entitled to judgments in the amount of those false profits.

149.    The Receiver, on behalf of the Oasis Entities, is entitled to the return of that money through disgorgement or any other applicable remedy.

WHEREFORE, the Receiver asks this Court to enter judgment against each Defendant in the amount of each Defendant's false profits, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

Dated:  April 14, 2020                    Respectfully submitted,

s/ **Jared J. Perez**
Jared J. Perez, FBN 0085192
jperez@wiandlaw.com
Larry Dougherty, FBN 0068637
ldougherty@wiandlaw.com
WIAND GUERRA KING P.A.
5505 West Gray Street
Tampa, Florida  33609
Tel.:    (813) 347-5100
Fax:    (813) 347-5198

*Counsel for Burton W. Wiand, Receiver*